provide Hizballah pictures of every location in Israel.[5]

c)      When KARAKI's assistant, Individual A, delivered the sample counterfeit United States currency to KARAKI, Individual A jokingly opined that the CW might be an "undercover." KARAKI showed the CW approximately two $100 bills and stated that one of them was "pen" quality and the other was "machine" quality. KARAKI explained that "pen" quality meant that it could pass a common test in which a particular type of ink was applied to the bill; "machine" quality indicated that the bill could fool the counterfeit-detection machines used in banking institutions. The CW stated that his first order would be for approximately $1 million — one half "pen" quality and one half "machine" quality. The CW cautioned that samples of each bill would need to be sent to his partners in Philadelphia for examination and testing. KARAKI approved this plan. KARAKI allowed the CW to purchase approximately six $100 samples at approximately 26 cents per dollar, and agreed that the price of the counterfeit currency could be negotiable depending on whether the CW paid HARB's commission. HARB thereupon took the approximately six samples and agreed to mail these to a Philadelphia address provided by the CW.

d)      KARAKI stated that the price of the stolen United States currency was non-negotiable at 60 cents of face value. KARAKI also made it clear that approval from Hizballah was needed to release this stolen currency and that he would need at least a day's notice to obtain this approval. KARAKI directed the CW to keep in touch with HARB regarding the purchases of counterfeit and stolen currency.

18.      Subsequent to that meeting, defendant DIB HANI HARB showed the CW a photo album which HARB advised contained the six sample counterfeit bills hidden amidst pictures of a child. The two then mailed the album to Philadelphia, where the CW advised that his associates would test the money. After confirming on or about February 23, 2009, that the album had arrived back in the United States,[6] the CW met HARB, on or about February 24, 2009. HARB then called defendant HASAN ANTAR KARAKI, and KARAKI and Individual A soon joined the meeting. With everyone together, the CW informed KARAKI that the approximately six sample $100 bills had been tested by his partners and that the CW would proceed with a large transaction. KARAKI stated that he would deliver the counterfeit currency first, and that the CW could later make payment in a safe manner. KARAKI also showed the CW counterfeit 200 Euro notes and another counterfeit $100 bill. KARAKI explained that this $100 bill was also made in Iran like the "pen" and "machine" samples.

19.      Upon his return to the United States, the CW met defendant MOUSSA ALI

---

[5]      This corresponds to public reports about the Iranian launch of a satellite called "Omid" on or about February 2, 2009.

[6]      Subsequent testing of the counterfeit notes provided to the CW by KARAKI indicated that they were, in fact, all counterfeit.

HAMDAN on or about March 3, 2009. The CW told HAMDAN that the CW had negotiated with defendants DIB HANI HARB and HASAN ANTAR KARAKI to obtain the counterfeit United States currency. HAMDAN stated that KARAKI had been involved in counterfeiting for a long time. The CW showed HAMDAN a sample counterfeit 200 Euro note that KARAKI had given him. HAMDAN stated that this sample was good.

20.     On or about March 3, 2009, the CW placed a call to defendant DIB HANI HARB, where HARB then connected the CW to defendant HASAN ANTAR KARAKI directly; the CW thanked KARAKI for meeting the CW, and KARAKI affirmed his desire to do business with the CW. The CW offered to send KARAKI a thank-you gift, and KARAKI provided his home address [in the *Dahiya*].

21.     In or about April 2009, defendant DIB HANI HARB traveled to Florida to meet the CW, the UC, and defendant MOUSSA ALI HAMDAN. The purpose of this trip was for HARB (escorted by HAMDAN) to meet the UC and answer any remaining questions about the impending, large purchase of counterfeit United States currency from Hizballah.[7]

a)     During this visit, HARB made several, explicit statements about his connection to Hizballah to the CW and the UC. For example, HARB noted that his father-in-law (later determined to be defendant HASSAN HODROJ)[8] was an influential figure in Hizballah and that Hizballah Secretary General Hassan Nasrallah presided at his (HARB's) wedding. HARB acknowledged that the United States [government] viewed Hizballah as a terrorist group. In addition, HARB told the UC that his medical clinic in the *Dahiya* was simply a cover for his activities on behalf of Hizballah, and described the *Dahiya* as "all Hizballah, Terrorism Hizballah." HARB stated that Hizballah receives a great deal of money from Iran and told the UC that Hizballah maintains small cells throughout the world. HARB cited Hizballah's attack on a Jewish facility in Argentina as an example of the work of one of these cells.

b)     In this meeting, defendant DIB HANI HARB provided additional details about the stolen currency offered for sale. HARB explained that the stolen money was generated from robberies conducted by Hizballah cells; the stolen funds were thereupon sent to Iran before ultimate distribution to Hizballah in Lebanon. HARB said that this type of money had previously been furnished to people associated with Hizballah's security forces and now was used to raise funds for Hizballah. HARB advised that some of the stolen currency was dye-stained and that it was therefore unavailable for sale. HARB gave a dye-stained Swedish krona to the UC and indicated that $2 million worth of this Swedish currency was available for sale as a result of a bank robbery that was

---

[7]     Prior to this meeting, the CW spoke with KARAKI over the phone, and KARAKI promised to send Individual A as his representative to the Florida meeting if HARB was unable to enter the United States for any reason.

[8]     HODROJ is publicly recognized and acknowledged as a member of Hizballah's Political Council.

executed by Hizballah supporters.  HARB negotiated a purchase price with the UC of 23 cents per dollar for the counterfeit United States currency[9] and 60 cents per dollar for any future sale of stolen currency.  HARB stated that the price of delivery to the United States would be 5% of the total value of each shipment, and that he would take an additional 3% commission from every deal.  Payment for the currency would be due upon its receipt.

22.     On or about June 11, 2009, the CW again met defendant DIB HANI HARB and Individual A.  Individual A advised the CW that his brother had been recently arrested in Lebanon for spying on behalf of Israel.[10]  Individual A reported that this caused significant problems within Hizballah for KARAKI because Individual A's brother had also worked within KARAKI's counterfeiting operation.  Individual A stated that this scrutiny was the reason for a delay in KARAKI shipping counterfeit money to the CW.  Individual A suggested new shipping arrangements for the counterfeit money promised to the CW, while trying to pitch the CW to move forward on even bigger transactions of counterfeit money.  Individual A advised the CW that all types of counterfeit currencies were available for the CW, including Kuwaiti dinars and United States dollars.  Individual A advised against a prior plan to hide counterfeit currency in a furniture shipment because, apparently, furniture shipments from Beirut were being scrutinized [which increased the chances of a seizure by law enforcement authorities].  Individual A instead suggested that the CW send a U.S.-registered vehicle to Beirut, so that Individual A could pack the car full of counterfeit money (up to $1 million) before sending it back to the CW.  Individual A advised that he had previously smuggled millions of dollars in this manner.

23.     On or about September 2, 2009, the CW received approximately $9,200 in counterfeit United States currency in Philadelphia by mail delivery.  The currency was hidden inside a photo album.  On or about September 3, 2009, the CW spoke via telephone with defendant DIB HANI HARB, and HARB confirmed his role in sending the counterfeit money.

*Counterfeit Passports*

24.     During the meetings with Individual A and defendants HASAN ANTAR KARAKI and DIB HANI HARB, in or about February 2009, where they discussed the sale of counterfeit and stolen money, KARAKI also offered the CW British, American, or French passports, and even displayed for the CW wooden-handled visa stamps that KARAKI would use to make fake passports appear more authentic.  KARAKI provided a telephone number for future contact if the CW wanted to purchase these fake passports/visas.

25.     In a subsequent meeting with defendant DIB HANI HARB in Florida in or about April 2009, HARB advised the CW and the UC that "they" [Hizballah] could make fake UAE

---

[9]     HARB passed counterfeit $100 bills during his stay in Florida, at least one of which was recovered by the FBI.

[10]    This fact was confirmed through publicly available information.

-12-

passports, as well. HARB claimed to possess a fake Italian passport, and they discussed defendant HASAN ANTAR KARAKI's ability to make a fake Italian passport for the UC's associates. HARB stated that all that he needed to obtain these fake documents was a photograph and the corresponding biographical data.

26.     On or about May 8, 2009, the CW contacted defendant HASAN ANTAR KARAKI at the phone number KARAKI had provided. In addition to advising the CW that he (KARAKI) was personally taking care of the shipment of counterfeit currency to the CW, KARAKI went on to discuss fake Italian passports and driver's licenses that he could sell to the CW for 7,000 Euro. KARAKI explained that the passports were genuine books that were acquired through Italian immigration officials. KARAKI instructed the CW to send the photographs for the fake passports to his home address and send the corresponding biographical information for each passport to HARB via facsimile.

27.     On or about May 12, 2009, defendant HASAN ANTAR KARAKI called the CW and asked if the CW was still interested in obtaining the fake passports. This time, KARAKI offered both Italian and Czech Republic passports; he noted that an unidentified male was traveling to the Czech Republic for the purpose of obtaining the passports. KARAKI reiterated the procedure that the CW should follow: sending photographs to him (KARAKI) and biographical information to HARB's fax machine. KARAKI promised that the passports would be ready in approximately seven days and that they would thereafter be mailed from either Italy or the Czech Republic. KARAKI promised to send a text message relaying payment instructions to the CW. Those instructions arrived via text message later, on or about May 12, 2009. KARAKI directed that payment be made to "Dib Hani Harb" at a particular bank account in Lebanon. Later, HARB personally transmitted his swift code and bank information to the CW to facilitate the transfer.

28.     On or about May 21, 2009, defendant DIB HANI HARB spoke with the CW via telephone. In that conversation, HARB stated that he could get the CW anything the CW wanted from Hizballah because of his father-in-law's (HODROJ) high-ranking position in Hizballah.[11]

29.     Also on or about May 21, 2009, defendant MOUSSA ALI HAMDAN and the CW spoke about the fake passports. HAMDAN told the CW that he (HAMDAN) would assist the CW in making payment for the passports ($10,000) as partial satisfaction of his debt to the CW [for purchases of purportedly stolen/counterfeit goods, see supra]. HAMDAN reiterated this agreement to pay ($10,000) for the two fake passports on or about May 27, 2009, and the CW handed HAMDAN a sheet of paper with HARB's banking information. HAMDAN added that he had a contact in Europe who could supply fake passports for less money (approximately $5,000).[12]

_____

[11]     Publicly available information confirms that HODROJ is a member of Hizballah's Political Council.

[12]     In fact, MOUSSA ALI HAMDAN later took steps to obtain a fraudulent passport for the CW from a contact in Venezuela.

-13-

30.     In or about June 2009, the CW met with defendant DIB HANI HARB and completed negotiations with HARB for the purchase of two fraudulent passports from HARB and defendant HASAN ANTAR KARAKI.  The total sale price for the two passports was to be approximately $19,600.

31.     On or about June 11, 2009, at the direction of defendant MOUSSA ALI HAMDAN, the CW received approximately $5,000 cash on behalf of HAMDAN from an individual known to the CW as "Mohamad."  "Mohamad" told the CW that this was the amount that HAMDAN had instructed him to bring.  In a phone call with the CW, HAMDAN agreed to supply the remainder of the cash (another approximately $5,000) at a second meeting with "Mohamad."[13]  That second meeting occurred on or about June 13, 2009, during which "Mohamad" delivered another approximately $5,000 cash to the CW and acknowledged that he was defendant HAMZE EL-NAJJAR's brother.

32.     On or about June 11, 2009, the CW delivered approximately $5,000 cash to defendant DIB HANI HARB and asked that HARB proceed with creating the two fraudulent passports earlier requested.[14]  The CW delivered the other approximately $5,000 cash to HARB on or about July 13, 2009.  On or about June 29, 2009, a package was delivered to the CW in Philadelphia from "Kassem Abbas, Dahieh Hady Nasrallah, Beirut, Lebanon."  Inside that package were two fraudulent passports that the CW had earlier ordered from defendant HASAN ANTAR KARAKI and HARB, one from the United Kingdom and one from Canada.  Both were hidden inside the covers of a photo album.  The photographs inside these passports were the same photographs supplied to KARAKI by the CW on or about May 18, 2009.  Subsequent investigation revealed both passports to be legitimate passports (obtained in the name of other people) with counterfeit pages inserted and displaying the photos supplied by the CW.  On or about June 30, 2009, the CW made the remainder of payment for these passports by transferring $9,600 from the CW's account to the account designated by KARAKI and HARB: a bank account in the name of "Dib Hani Harb" at a bank in Lebanon.

---

[13]     Upon returning to the USA, the CW positively identified a photograph of defendant EL-NAJJAR's brother as the man "Mohamad" whom he met.

[14]     This is also corroborated by a blatant text message that HARB sent to the CW on or about June 12, 2009: "One is British and one is a 100% genuine Canadian."

-14-

*Conspiracy to Provide Material Support to a Designated Foreign Terrorist*
*Organization (Hizballah) –– Machineguns –– 18 U.S.C. § 2339B*

33.    On or about May 13, 2009, at a meeting in New Jersey, defendant MOUSSA ALI HAMDAN asked the CW to provide pistols — concealed inside stolen vehicles — for shipment to Lebanon; HAMDAN stated that he and the CW could make a lot of money on this deal.[15] Later, on or about May 27, 2009, HAMDAN bragged to the CW that he would introduce the CW to a buyer who was interested in purchasing bulk quantities of pistols and rifles.

34.    On or about June 13, 2009, the CW raised the idea of a weapons deal with defendant DIB HANI HARB, and HARB and other co-conspirators embraced the idea. On or about June 13, 2009, the CW showed pictures to HARB of firearms, including Colt M4 Carbines ("M4"),[16] and indicated that he could obtain these guns.[17] HARB stated that he wanted to purchase these weapons from the CW. The CW responded that he would not sell any of the guns to HARB without assurances from high-level Hizballah officials that the weapons were bound for Hizballah and would not be intercepted. HARB immediately placed a call to someone, and the CW heard him indicate that he needed to meet in order to discuss a matter in private. When the CW asked HARB to identify the speaker on the phone, HARB indicated that he had called a high-level Hizballah official ("Individual B"). The CW expressed amazement that HARB could so easily contact a high-level Hizballah figure, and HARB showed the CW a contact entry on HARB's phone for Individual B and wrote out the name of Individual B for the CW on a piece of paper (which the CW retained).

35.    Soon thereafter, the CW again met defendant DIB HANI HARB. HARB stated that he had discussed the proposed purchase of guns for Hizballah with Individual B. HARB said that Individual B would pass the information to the individual responsible for procuring weapons for Hizballah. During that conversation, HARB received a call from someone apparently requesting pictures of the weapons that the CW wanted to sell. The CW offered to provide the pictures on his cellular phone. HARB asked the CW to e-mail the photographs to him for further examination.

---

[15]    MOUSSA ALI HAMDAN also noted that he knew an individual in Beirut who could move weapons through the Beirut ports without scrutiny. The CW asked HAMDAN to discuss with his contact in Lebanon what types of weapons were needed.

[16]    I am aware that the Colt M4 Carbine is a machinegun manufactured in the United States. The rifle's short barrel, light weight, collapsible stock, and accessory rails make it useful in close-quarter fighting. These rifles are capable of quickly firing a large number of bullets and can be loaded, among other things, with a 90-round cylindrical magazine. M4s are "machineguns" as that term is defined by federal law. "The term "machinegun" means any weapon which shoots, is designed to shoot, or can be readily restored to shoot, automatically more than one shot, without manual reloading, by a single function of the trigger." 26 U.S.C. § 5845(b). Herein, the terms M4 and machinegun are used interchangeably.

[17]    FBI-Philadelphia agents provided these photos to the CW.

-15-

36.     FBI agents in Philadelphia [on behalf of the CW] subsequently sent defendant DIB HANI HARB an e-mail containing the photographs, as HARB directed. HARB later called the CW to confirm receipt of the e-mail and stated that he provided it to Hizballah leaders responsible for weapons procurement.

37.     On or about June 23, 2009, defendant DIB HANI HARB and the CW together met defendant HASSAN HODROJ.[18]   In summary, the CW and HODROJ had the following conversation:

a)      HODROJ stated that HARB had informed him that the CW could supply Colt M4 Carbines to Hizballah. HODROJ asked why the CW was offering the M4s for sale. The CW expressed support for Michael Aoun [a/k/a Michel Aoun], a political ally of Hizballah. HODROJ stated that he understood and noted that Aoun signed a cooperation agreement with Hizballah and that they work very well together. The CW also said that Hizballah was the only group in Lebanon with sufficient funds to pay for the weapons. HODROJ acknowledged that this was correct. The CW said that approximately 1,200 M4s were available at a price of approximately $1,800 per M4 and could be shipped in units of approximately 200 guns each. HODROJ agreed to this quantity and price, and that they should begin with a shipment of approximately 200 M4s.

b)      HODROJ added that Hizballah did not need the Glock pistols that were in the picture sent to HARB by the CW. HODROJ said that Hizballah needed only "heavy machinery." HODROJ explained that Hizballah would use the "machinery" offered by the CW in their fight against Jews and to protect Lebanon. In their conversation, HODROJ counseled caution in moving forward because of the potential criminal exposure. HODROJ specifically acknowledged — in the presence of HARB — that he was aware of criminal penalties for this sort of dealing with Hizballah, indicating that, if ones deals with Hizballah in the United States, one could go to jail for 100 years..

c)      HODROJ instructed the CW to ship the M4s to the Port of Latakia in Syria and asked for an estimate of when the shipment would arrive. The CW said that he would want payment when the goods arrived in Syria and, at that point, would relinquish all responsibility. HODROJ explained that the Port of Latakia is "ours" [Hizballah's] and that Hizballah brings anything it wants into that Port. HODROJ also stated that payment would be made in cash to avoid tracing the payments back to Hizballah.

d)      HODROJ asked the CW to assist Hizballah in obtaining other items from the United States. Specifically, HODROJ said that Hizballah needed communications system equipment and spy systems from the United States. HODROJ told the CW he was involved in weapons and technology procurement for Hizballah. HODROJ directed the CW to work through HARB for the M4 deal. Following the meeting, HARB said to the CW that, if the CW sold M4s to Hizballah,

---

[18]     During his visit to Florida in or about April 2009, defendant DIB HANI HARB stated that his father-in-law (HODROJ) was involved with the smuggling of weapons. The CW subsequently identified a photograph of HODROJ as the man he met with HARB.

he (HARB) would get a commission on the sale.

38.     On or about June 26, 2009, defendant DIB HANI HARB called the CW and reported that defendant HASSAN HODROJ was impressed with the CW.  HARB emphasized that this was a very serious transaction and that the CW needed to provide the M4s, as promised.  The CW agreed to seek approval from his boss, the UC, as well as the UC's boss to ensure that the transaction would go smoothly.

39.     Conversations took place between the CW and defendants DIB HANI HARB and HASSAN HODROJ over the next few months in which the defendants continued to make arrangements for Hizballah's purchase of machineguns.

        a)     On or about August 5, 2009, HARB sent the CW a text message in which HARB stated [in code about the guns] that Individual B was in Iran making headway on the "tires:"

                I just received a call from Iran from [Individual B]
                regarding the tires.  He is asking me where they are
                and telling me that we should not delay.

        b)     During a telephone call with the CW on or about August 9, 2009, HARB passed the telephone to HODROJ.  The CW thanked HODROJ for taking time to meet with him recently and promised delivery of the "1000" [machineguns] in a couple of months.  The CW and HODROJ discussed that the "1000" would be sent in one shipment and HODROJ indicated that they would get themselves "ready."

        c)     During a telephone call with the CW on or about August 30, 2009, HARB again passed the telephone to HODROJ.  In that call, the CW confirmed the quantity of weapons being shipped and assured HODROJ that everything was ready.  HODROJ and the CW discussed the "tires" [machineguns], a possible delay in shipping [the machineguns], and the need to be careful.

        d)     On or about September 2, 2009, the CW asked HARB about the continued involvement of Individual B and HARB's father-in-law (HODROJ).  HARB confirmed their continued involvement and explained that Individual B was in charge of paying for the weapons.

        e)     On or about September 15, 2009, HARB sent a text message to the CW stating that the matter they have been discussing [the shipment of machineguns] has been reviewed by the "gamehetma,"[19] that "they are very happy."

_____

        [19]     It is my understanding that the Arabic phrase "gamehetma" is a colloquial term used by Lebanese Sh'ia that roughly translates to "our group;" some of the defendants, including HARB, used the term in conversations with the CW to refer to Hizballah.

### *Conclusions*

40.   Based on the facts set forth above, I submit that there is probable cause to believe that the following defendants have committed violations of the statutes set forth below, and I request that arrest warrants be issued charging that:

a)   from in or about June 2009 through and including in or about November 2009, HASSAN HODROJ and DIB HANI HARB conspired to provide material support to a designated foreign terrorist organization, Hizballah, in violation of Title 18, United States Code, Section 2339B;

b)   from in or about July 2008 through and including in or about November 2009, DIB HANI HARB, HASAN ANTAR KARAKI, and MOUSSA ALI HAMDAN conspired to provide material support to a designated foreign terrorist organization, Hizballah, in violation of Title 18, United States Code, Section 2339B;

c)   from in or about January 2008 through and including in or about November 2009, MOUSSA ALI HAMDAN, HAMZE EL-NAJJAR, a/k/a "Hamze Al-Najjar," MOUSTAFA HABIB KASSEM, and LATIF KAMEL HAZIME, a/k/a "Adanan," conspired to transport stolen goods, in violation of Title 18, United States Code, Section 371; and

d)   from in or about January 2008 through and including in or about November 2009, MOUSSA ALI HAMDAN, HAMZE EL-NAJJAR, a/k/a "Hamze Al-Najjar," MOUSTAFA HABIB KASSEM, ALAA ALLI AHMED MOHAMED, a/k/a "Alaa Ahmed Mohamed Abouelnagaa," MAODO KANE, and MICHAEL KATZ conspired to traffic in counterfeit goods, in violation of Title 18, United States Code, Section 371.

SAMUEL SMEMO, JR.
Supervisory Special Agent
Federal Bureau of Investigation

Sworn to and subscribed before me,
this _____ day of November, 2009.

BY THE COURT:

HONORABLE TIMOTHY R. RICE
*United States Magistrate Judge*

-18-